Your Honor, I am pleased to report that I now have a new understanding of the problem of congestion in the courts. May it please the Court, my name is Jared Smith. I represent Tandy Miller, who appeals the grant of summary judgment against her on her claims of gender and national origin discrimination and retaliation. I wish to reserve five minutes for rebuttal. If the facts in this case were looked at in their most sinister lights, in their most sinister light, Tandy Miller could make a claim that she was a victim of attempted murder. She didn't make that claim. She claimed employment discrimination. Because she was a female and she competed with a male for a job, he would, he undertook a campaign of terror against her. He used his position and authority in the detention facility to carry out his policy as he had stated, that there is no place in corrections for women, or that women have no place in corrections. He would deliberately assign her to work directly with the most dangerous inmates in the facility. He would deliberately provoke their resentment immediately before she came on shift. And he used his control of the doors to signal to her, to or aid for her in the event of an emergency or peril. He was allowed to do this because he was Hispanic and Mrs. Miller was not. She complained and when another supervisor intervened to stop the discrimination, that intervening supervisor was stripped of his supervisory authority. And because of her gender, she and that intervening supervisor were accused of having an affair. And we wouldn't expect someone from Hawaii to know about alleged affairs in a detention facility in a small town in Arizona. But in fact, it went that way. She was demoted from a position and banned from receiving any further training at the same events that Mr. Lemley would attend. She was denied pay raises because of her additional job duties. And she was not given a merit pay raise at the same time a male coworker received the increase in pay. At the earliest practical moment, before they even made it from the airport and dropping off the ACA team, she was denied the opportunity to work overtime as other more compliant males and Hispanics were allowed to do. When Mr. Lemley, her supervisor, advocated on this issue, he was promptly punished by being required to take the rest of the week off and use his vacation pay instead of the accumulated comp time that he should have been allowed to use. She resigned because she was concerned for her safety in having to work alone with Mr. Luzania, the person who had been setting her up for harm in the facility. It has been determined that in her application for unemployment benefits that that was reasonable on her part. She had good grounds to resign from her employment. The district court in Arizona has improperly refused to consider relevant admissible evidence in support of her right to trial and has refused to review the facts in the light most favorable to her claim and draw any inferences therefrom in her favor. Such a decision is contrary to the law and must be reversed. In my brief, I indicated that I had not found any cases indicating whether or not the standard of review for determining whether or not a case was, whether or not there was a continuing legal violation. And I have since found a Rhode Island, a case that came from Rhode Island, that the determination of whether or not a continuing violation exists is reviewed de novo. The defendants have asserted that Ms. Miller's complaints were outside the scope of her EEOC charge. I just interrupt you there for a minute because there's so much going on in this case that it's almost hard to figure out where to start asking you questions, but that's maybe a good place to start, to try to break this down a little bit. Now the court, the district court, also claims were precluded because they were not brought in the charge before the EEOC, and I'd like to just focus on one of those, and that is the failure to promote claim. Can you tell us what, if anything, in the EEOC charge suggests that that was brought to the EEOC? A question that I don't know the answer to is whether or not the charge of discrimination is designed to protect the employer or the employee, but the law says that it's to be construed liberally. I understand that. And so giving you the benefit of the doubt of liberal construction of the charge, could you point to what in the charge deals with the failure to promote allegation? The first sentence says, I was subjected to different terms and conditions of employment. And then more specifically, it said, since June 2009, I've been subjected to different terms and conditions of employment. And so I think that if How is that more specific? And indeed, how is it specific at all? I mean, if that sentence suffices, then that's all an EEOC complaint would ever say, because you're arguing now that that encompasses anything that happened to her, and it's enough just to say, I suffered from different terms. Is that the law? I think the charge should be read to say, both before and after June 2009, I was subjected. That doesn't help, because is the word promote or failure to promote or anything like that identified? I mean, what seems to me is you're saying just filing an EEOC claim means, well, I was discriminated against, so any instance I can come up with later that constitutes discrimination is fair game. And I don't think that's what the law is. I know that if she were to look at this, and the charges are usually drafted by the EEOC, and if she were to look at that and say, I was subjected to different terms and conditions of employment, she would say, well, that probably covers it. So she would not necessarily be alerted to say that. But nevertheless, this That's an answer to the question. It's related. It's a law such that all you have to do is to say, I was discriminated against, and that by having to have your subsequent complaint in court be matters that were previously brought to the attention of the EEOC. I think that the law has already addressed that question by saying Well, I don't think it's addressed it the way you're advocating, has it? Well, yes, because Can you give me a case that says it's enough to file a complaint that says, I had different terms and conditions, and that's it? And after that, you can raise anything that might speak in some general fashion to that in court? If they're closely related to the claims that are put in the charge The only claim you've identified is, I suffered from different terms and conditions. As to what? I mean, that's like filing a complaint, a negligence suit, and saying, I suffered by injury due to defendant's negligence, period. With no displeasing, that might be enough, but usually a little more is required. She does reference the assignments that she was given. She does reference Well, let's zero in. The charge is actually very specific, isn't it, the EEOC charge? It describes very specifically what the discrimination was, that Luzania discriminated against Miller because of her gender and race, through a number of specific acts. You've just talked about some of those acts, that Miller complained of the conduct, beginning in October 2009, that Miller complained about Luzania's treatment, and she was retaliated against, and that all of these things resulted in her constructive discharge. That's basically what the charge says. Now, none of that speaks to failure to promote. I just took that one I believe, Your Honor, that the failure to promote was retaliatory. So you're folding the failure to promote claim into the retaliation claim. All right. When was it she didn't get the promotion? I believe it may have been in May of the year after she first complained. Wasn't it in June of 2008 when Luzania received the promotion? No. What we're talking about in the failure to promote, well, there is the failure to promote when she first applied for the job, but when she came back, there's a second failure to promote because she had I'm sorry, and then there was June 2009. That one went to Pruszynski? No, that's a merit pay increase that went with him. The promotion that she didn't get was they wouldn't give her a pay raise or a reclassification when she assumed the duties of acting ACA coordinator, and she started writing policy and working at a higher level than just a detention officer who collects urine and counts heads does. And so they did fail to promote her. Would that have been a promotion or a pay increase during the time that she was working on the report or preparing for the inspection? Actually I believe that she was promoted. There's evidence in there that she received the title, but she did not receive the reclassification. Well, the ACA assignment was a temporary one, wasn't it? I've only got two minutes left. I want to be able to reply to him. I don't know if... Okay, if you choose not to answer the question, that's your option. What's your question? My question was, wasn't the ACA assignment a temporary one? I mean, you're only going to work on it as long as they're preparing for the inspectors. Yes, but if it lasts for over 30 days, according to county policy, you're supposed to get a pay increase. But a promotion? Promotions is something that would ordinarily be lasting. So I guess I'm lost as to what it is the denial of promotion is supposed to relate to. Okay. May it please the court, good morning. John Kastner on behalf of Epple East Graham County. Could you turn your microphone a little bit? Thank you. How's that? First of all, I think when we're talking about Ms. Miller's claims, we have to start with the hostile work environment claim that she's made in this case. As this court is aware, in order for a hostile work environment claim to be actionable, it has to be timely. In other words, at least one act constituting part of the hostile work environment has to have occurred after, in this case, December 9th, 2009. And I think that's where we start with the hostile work environment claim. And in this case, Ms. Miller hasn't shown that after that date, she was subjected to a hostile work environment. There's no evidence she was subjected to verbal or physical conduct of a sexual nature or that she was treated differently from male employees or from Hispanic female employees. The terms and conditions she was subjected to after that date weren't sufficiently severe or pervasive. They weren't pervasive because they weren't frequent. What she complains of after December 9th, 2009 is that at some point in August 2010, Sergeant Luzania wouldn't respond in a promptly manner to her radio calls or calls to open doors. She testified that that was not frequent. And the evidence in this case from Luzania himself and from Mr. Aranda is that that would happen from time to time, but it would happen to men and women. So there's no evidence that she was treated differently from anyone else in the facility. There's a discussion with respect to a laundry comment. That's not the type of utterance that constitutes an actionable hostile work environment. Can I just interrupt you for a moment just on the dates issue? If we were to find that some of these allegedly harassing events occurred within the time limits and they were related, couldn't we find that the ones that were before, was it December 2009? Yes, sir. The ones before, it was relation back that they were all tied together. So wouldn't that bring those pre-December 2009 events into play? It would. It would bring those 2009 events into play if a determination was made that they were somehow related to the overall alleged hostile work environment. And you look at the people who are alleged to be subjecting the employee to a hostile work environment. So I would submit that even if you get to the point where you determine that there's perhaps a question as to whether it's a hostile work environment at any point after December 2009, that what she alleged prior to that doesn't come in. Because there's, again, there's no evidence that the stuff that happened prior to that was or constituted a hostile work environment whatsoever. I think what she's talking about that happened before December 2009 is the suggestion that she was given a different calendar and not allowed to work in the control room for a certain number of days. That, and called upon to work in the alpha pod more than. And that strikes me as perhaps the sample of a claim that does extend over time. I mean, the shift rotation is always going to occur. And if you have a persistent or at least an allegation with some evidence of a pattern of assignments that puts her in that less desirable, more dangerous location more than others, why isn't that enough to make that a case for a hostile work environment? Well, I think it would still have to constitute, it would still have to constitute a hostile work environment related to her gender. So there would still have to be some evidence that the actions. There's evidence that there are comments that women don't belong in corrections. It may not be a powerful case, but the question here is whether it can survive summary judgment. Why isn't that enough to survive summary judgment? Because that's not the type of utterance that constitutes offensive language sufficient to sustain this type of case. No, but it may explain that this assignment pattern where she appears to have been disadvantaged as compared to the others might be linked to the fact that somebody doesn't think she belongs in that line of work to begin with. Well, I would agree with that if it were the case that the schedule was in fact implemented. She objected and it wasn't implemented. With respect to the frequency of the APOD situation, Sergeant Pruszynski testified that he and not Sergeant Luzania is the one who made that schedule. So he's the one who determined where she was going to be and when. So I'm not sure that any comment by Aranda is tied to the argument that Pruszynski did something with the schedule. So I think you have to look at the totality of the circumstances. In this case, factually, there's a lot of stuff going on here. So there's two questions, I think. One is whether there is some event that is after December 2009 that the plaintiffs can establish as part of this kind of process. There's a hostile environment directed at the plaintiff and there are a couple of examples which could meet that criteria. For example, the refusal by Gatwood to allow Miller to work overtime. Now the district court said that it was not going to consider that allegation because the county presented a legitimate reason for that. But that is at least an allegation and there is at least evidence and it may be a disputed fact as to the reason why the county did what it did. But if the plaintiff is correct that that's part of a pattern in practice, then that sweeps back into the case, these pre-December 2009 events, right? So that's sort of the first question. Is there something that allows the relation back doctrine to apply? And then the second question is, okay, if you give the plaintiff the benefit of the doubt as to all of these smorgasbord of events that is alleged here, is it enough to make out a case of severe or pervasive hostility? So isn't that how we have to kind of break it down?  So if we get to that second part, why isn't it severe or pervasive if you think about the failure, the allegation of the failure to answer the plaintiff's calls, that she was locked up in the pod, that there was an incitement of inmates to become angry at her, the incident with the toilet brush, the starting up of rumors of an affair to kind of discredit her? I mean, if you put all that together, why doesn't that amount to a pervasive or severe? Sure. Well, I think when you put it in those terms, it sounds like it could. But when you really look at the facts in this case, the type of conduct that's being alleged, aside obviously from the fact that it's disputed, in my estimation was not sufficiently pervasive. In other words, this stuff wasn't happening with the type of frequency that we typically see in hostile work environment cases. The thing, the issue with the radio calls and the doors, Ms. Miller herself testified that happened on a couple of occasions in 2009, in the fall of 2009, and then it started up again, but she doesn't describe any frequency in the summer of 2010. And I also, I just don't see that this is the type of behavior that is related to gender discrimination in a hostile work environment claim. There's really no evidence that with respect to what she's describing, other similarly situated individuals weren't treated the same way. Well, that goes to the disparate treatment claim. It does. Now the comment, you've been asked about already, that's what makes it appear, the comment, women don't belong in corrections. That's what makes it, ties it up to gender hostility. These various, like the urine in the toilet brush event is on its face a gender neutral act of, if it happened, it's a ridiculous act of workplace misbehavior. But combined with the women don't belong in corrections comment, it could be viewed differently, couldn't it? Well, I guess it could be viewed in that light if in fact there was one scintilla of evidence in this case that Lusania is the one who put the urine in the toilet brush holder. There is no evidence of that. And she testified that that happened three times. And that didn't really start to happen until the middle part of 2010 when she started to clean the restrooms once a week. And there were other people that cleaned the restrooms too. So there's no evidence tying Aranda to that discreet act, if you will. And I'm going to have to hurry this. I hope that answers your questions. I'm going to have to try to blow through this. We have some ground to cover. And I would draw, on the hostile work environment claim, you know, I would just draw the court's attention to Western Dorf versus West Coast Contractors of Nevada. That's at 712 Fed Third 417. In that case, a coworker's suggestion that a plaintiff wear a maid costume and numerous sexual comments to her, coupled with the supervisor's apparent, at least, participation to some degree in those comments, and this was over a period of time, was not sufficiently severe or pervasive to constitute a hostile work environment. With respect to the disparate treatment claim, any of these alleged acts that occurred prior to December 2009 are not timely and they're not actionable. And that's just the way it is. So we're really left with the following, and that's pursuant, as the Court knows, to the Morgan case. The following acts, hypothetically, could constitute as employment decisions, and these are the ones that would have happened after December 2009. The reclassification pay raise issue that the Court has already discussed, that was never raised in the EEOC complaint, and I failed to see how an investigation into that reclassification slash pay raise would have naturally sprung from the EEOC charge. The May 2010, again, Mr. Gatwood apparently didn't forward a recommendation from Mr. Lemley for a pay raise, same issue. In July 2010, there was the assignment to work the graveyard shift. September 2010, there was plaintiff's request to work a different shift for Mr. Luzania. August slash September 2010, when Mr. Gatwood did not let Ms. Miller work overtime after she was finished with her ACA tasks, and then we have the constructive discharge. That's the world of events that we have after December 2009. Time goes fast. I've talked about the pay raise with respect to the July reassignment. I failed to see how a July reassignment, where she's already a detention officer and she's on a temporary duty, and part of her job description is to work in the units. When she gets reassigned back to the units, which is her job, I failed to see that that's an adverse employment action. Overtime, there's no evidence that other similarly situated individuals were treated differently than her. The evidence in this case is that Mr. Gatwood just did not want her to work on the ACA audit anymore. That, in fact, if she wanted to go back to the unit, go back to the floor, as was part of her job, she was more than welcome. That evidence is undisputed in this case. The issue with respect to the different shift from Mr. Luzania, which I think sort of ties in with her constructive discharge case, in my estimation, that seems like it's better suited for the retaliation claim. It's really, for me, it's hard to sort of peg that one into a disparate treatment claim. But in any event, with respect to all of these, in order to survive summary judgment, not only does she have to make her prima facie case, she has to come back with sufficient evidence to sufficiently rebut the legitimate reasons that the county has given. And she hasn't done that in this case. And I'm going to touch briefly on the — in the retaliation claim, I'll also point out, too, that the Court should be aware that in 2013, the Supreme Court established the but-for causation standard in retaliation claims. And certainly, that hasn't been established in this case on her prima facie case of retaliation. And I am out of time. Thank you. Thank you. We'll have rebuttal. I offer to answer any questions. If not, I would like to point out that the one investigation that was conducted by the county's independent investigator relating to these same charges did bring into its scope all of these things that we've been talking about here. When they dug into the issue of discrimination, gender discrimination against Tandi Miller, all of these things came out. Let me just — let me ask you a question. Council says that anything before December 2009, with respect to the disparate treatment claim — and I take it that's also applicable to the retaliation claim — should not be looked at. What brings those events, whatever they are, what brings them into the — into your case, legitimately brings them into your case? The same conduct continued before and after. That's the locking of the doors. And I think the fact that Luz Inia is the principal perpetrator, though Aranda was the enabler of the discrimination — Luz Inia was the perpetrator of it. And Aranda is the one who favored Luz Inia over her. And I'm out of time in nine seconds. Okay. Thank you. We thank both of you for the arguments in this case, which is submitted. And now we'll move to Lemley v. Graham County.
judges: Clifton, Owens, Smith